UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| FIRST DATA TRANSPORTATION ) <br> SERVICES, INC., ) <br> ) <br>           **Plaintiff,** ) <br>    v. ) <br> ) <br> EULER HERMES NORTH ) <br> AMERICAN INSURANCE COMPANY ) <br> f/k/a EULER HERMES AMERICAN ) <br> CREDIT INDEMNITY COMPANY, ) <br> ) <br>           **Defendant.** ) <br> _____) | CIVIL ACTION NO.: <br><br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff First Data Transportation Services, Inc. ("FDTSI"), for its Complaint against Defendant, alleges and avers as follows:

## PRELIMINARY STATEMENT

1. The Defendant in this case is a large insurance company that received substantial premiums from Plaintiff in exchange for broad insurance coverage. Among other things, the insurance protected Plaintiff against credit losses arising from non-payment of amounts due from Plaintiff's customers (referred to as "Buyers" in the insurance policy), whose credit was pre-approved by Defendant. This action arises from Defendant's refusal to honor the promises in its insurance policy with respect to losses incurred by the Plaintiff for non-payment of amounts due from three Buyers: AAC Perishables Logistics, Inc. ("AAC"), Jet Reverse Logistics, Inc. ("Jet Reverse"), and NY Logistics, Inc. ("NY Logistics"). These losses exceed $5 million, and the net portion insured by Defendant exceeds $4.7 million. No exclusion in the policy bars or limits coverage owed to Plaintiff. Yet Defendant has nonetheless repudiated its contractual obligations

and refused to reimburse Plaintiff for losses covered by the policy. As a result of Defendant's wrongful conduct, in order to receive the benefit of the insurance coverage purchased from Defendant, Plaintiff has been forced to file this action for breach of contract and for bad faith refusal to pay.

## PARTIES, RELATED PERSONS AND ENTITIES

2. Plaintiff First Data Transportation Services, Inc. ("FDTSI") is a corporation organized under the laws of the State of Tennessee with its principal place of business at 7000 Goodlett Farms Parkway, Cordova, Tennessee.

3. Defendant Euler Hermes North American Insurance Company, formerly known as Euler Hermes American Credit Indemnity Company, is a corporation organized under the laws of the state of Maryland with its principal place of business at 800 Red Brook Boulevard, Owings Mills, Maryland.

4. Defendant provided coverage to Plaintiff under Business Advantage Credit Insurance Policy Number 5044946 (the "Policy"). A true and correct copy of the Policy is attached as Exhibit A.

5. Defendant delivered the Policy to Plaintiff at its headquarters in Cordova, Tennessee.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1332, because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

7. This Court has personal jurisdiction over Defendant, because Defendant has submitted to the jurisdiction in this state by (a) transacting business in Tennessee, by virtue of its selling the Policy at issue in this case to Plaintiff in Tennessee; and (b) entering into contracts of

insurance covering an entity located within Tennessee at the time of contracting.  Section X-E of the Policy states that the Policy will be governed and construed according to the laws of the state named in the Declaration as the insured's address.  (*See* Ex. A at 11.)  The Declaration identifies the address of the insured as Cordova, Tennessee.

8. Venue is proper in this Court under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Cordova, Tennessee.

## **FACTUAL ALLEGATIONS**

9. Plaintiff incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 – 8 above.

### **The PayCargo® System**

10. The PayCargo® System is a centralized, neutral, online worldwide freight payment system for the global maritime shipping industry.  It allows shippers, carriers, and freight brokers (also known as freight forwarders) to settle accounts rapidly and reliably within a standardized, secure platform.  The PayCargo System is a web-based application that can be accessed by customers.  These customers are either shippers or freight forwarders, who are directly or indirectly responsible for paying a carrier.  With traditional paper invoices, this payment process can take several days to two or three weeks.  Through the PayCargo System, a carrier or freight forwarder can be paid promptly, reducing overall time and costs associated with receiving paper payments.  As an example of a PayCargo System transaction, a shipper that is a PayCargo System customer will access the PayCargo System and direct the PayCargo System to pay a carrier.  The PayCargo System will then pay the carrier and debit the shipper's bank account.

11. PayCargo, LLC ("PayCargo") is a Delaware limited liability corporation with its principal place of business in Cordova, Tennessee.

12. As a member of PayCargo, FDTSI provides all of the operational aspects of the PayCargo System, and is the entity that suffers losses if Buyers fail to make repayment as described below.

13. FDTSI provides the web-based platform for the PayCargo System.

14. FDTSI makes the payments as directed by PayCargo System customers, and FDTSI then debits the customers' bank accounts.

15. There are two ways in which a PayCargo System customer may repay FDTSI: (a) through Overnight Debit, in which payment for shipment is debited from the customer's account within two to three business days; and (b) PayCargo Credit, in which a customer is given up to 30 days to make payment based on a pre-established credit limit.

16. FDTSI is not a carrier. FDTSI does not take possession of cargo nor does it ship cargo. Instead, Plaintiff provides a billing and payment system that facilitates freight and logistics costs.

17. The losses at issue in this action were experienced by FDTSI, which made payments at the direction of customers AAC, Jet Reverse and NY Logistics, and which has not been repaid by those customers.

**The Insurance Policy**

18. Since the 1980's, Defendant has provided credit insurance to FDTSI's former corporate affiliate, EFS Transportation Services ("EFS"). EFS's business model is similar to the PayCargo System. EFS provides billing and payment services to trucking companies, including extended payment terms, facilitating freight and logistics costs. EFS is not itself a trucking

4

company, and its does not sell fuel or transport a product. Defendant's employee, Mike Macaluso, has been the broker for the EFS credit insurance policies since the 1980's.

19. In late 2008, Macaluso met with then Senior Vice President and General Manager of EFS, Chris Courts, and EFS's then Director of Credit, Penna West. Courts and West explained to Macaluso that an EFS affiliate was being organized that would provide billing and payment services to shippers and carriers of maritime cargo. Courts and West explained the business model, which was similar to EFS's business model: FDTSI would facilitate the payment of freight costs and provide logistics between shippers and carriers, by providing prompt payment, and providing payment terms to PayCargo System customers, including extended payment terms for some customers based on a pre-approved credit limit.

20. Macaluso handled the initial insurance application for FDTSI, and provided a quote for credit insurance in November 2008. The initial credit risk policy provided by Defendant to FDTSI incepted in early 2009.

21. Defendant renewed the FDTSI credit insurance policy each year since 2009.

22. Plaintiff purchased from Defendant the Policy that is at issue in this action with an effective date of March 1, 2012 to February 28, 2013 (the "Policy Period"). The Policy has an applicable limit of $5 million per occurrence and in the aggregate. The Policy provides broad insurance protection against credit losses arising from non-payment by PayCargo System customers (Buyers) for amounts paid by FDTSI at the direction of PayCargo System customers.

23. Section II-A of the Policy provides:

> Subject to the terms and conditions of this Policy, we will cover you against credit losses due to the non-payment of amounts due from a covered Buyer for Shipments of Covered Products made by you during the Policy Period, on terms no longer than the Maximum Terms of Sale and which were invoiced in U.S. or Canadian dollars. You must retain for

your own account, any loss or part of a loss we do not cover due to Coinsurance or deductible, or Shipments in excess of Buyer Credit Limit.

(Ex. A at 3.)

24. Section II-B of the Policy provides:

Credit losses covered under this Policy are:

1. The Insolvency of a covered Buyer, or

2. Protracted Default due to slow payment of a covered Buyer.

(Ex. A at 3-4.)

25. Section II-D of the Policy provides:

The maximum amount of our indemnity under this Policy for covered credit losses is:

1. For each covered loss, the Net Invoice Value unpaid by the Buyer, up to the Credit Limit assigned to each Buyer, less your applicable risk retention as described in *Section V.C.*

2. For all covered losses in the aggregate, the Policy Amount shown on the Declaration.

(Ex. A at 4.)

26. As amended by endorsement, "Credit Limit" is defined as:

[T]he maximum amount of coverage we will allow for each Buyer under this Policy, in addition to any Temporary Increase as stated in an Endorsement to this Policy. *Each Buyer has its own Credit Limit*, which is either assigned by us or qualified by the Insured under the Discretionary Credit Limit.  (emphasis added)

(Ex. A at 18.)

### Defendant's Approval Of Buyers And Their Credit Limits

27. Pursuant to the Policy, FDTSI submitted to Defendant information regarding each of its PayCargo System customers (Buyers within the meaning of the Policy) to whom it wished to provide extended payment terms so that Defendant could evaluate each Buyer to determine

6

whether to approve the Buyer for coverage under the Policy and with what Credit Limit. Based on statements made by Defendant prior to the disputes at issue in this action, it is Plaintiff's understanding and belief that Defendant has a sophisticated underwriting process for approving Buyers and setting credit limits, which is confidential and proprietary to Defendant; Defendant has access to numerous proprietary sources of information that are not generally available to third parties; and for higher limits of credit, like those provided to AAC and Jet Reverse, Defendant's Credit Committee reviews a detailed package of information that includes a financial spreadsheet analyzing trends in the balance sheet, an income statement, debt repayment schedules, availability of bank lines, Standard & Poor's reviews, and other outside analysis.

28.   AAC, which is a freight forwarder, was approved as a Buyer by Defendant in July 2010. Thereafter, Defendant underwrote a number of increases to AAC's Credit Limit, most recently to $2.5 million.

29.   Jet Reverse, which is a freight forwarder, was approved as a Buyer by Defendant in November 2011. Thereafter, Defendant underwrote an increase to Jet Reverse's Credit Limit to $2.5 million.

30.   NY Logistics, which is a freight forwarder, was approved as a Buyer by Defendant in November 2010. The Credit Limit approved by Defendant for NY Logistics was $300,000.

**The Credit Losses Relating To NY Logistics, AAC and Jet Reverse**

**AAC**

31.   At the direction of AAC, FDTSI made a series of payments to carriers. Prior to January 2013, FDTSI made several payments at the direction of AAC, and FDTSI successfully debited AAC's bank account to obtain reimbursement for those payments. AAC had a 30 day

extended repayment period pursuant to the PayCargo Credit Program. Between January 14, 2013 and February 13, 2013, at the direction of AAC, FDTSI made a number of payments that totaled $2,489,940 (the "AAC Outstanding Payments"). On February 13, 2013, FDTSI debited AAC's bank account for the first of the AAC Outstanding Payments. The debit was returned unpaid (Non-Sufficient Funds). FDTSI immediately suspended AAC's account, preventing any further payments to carriers at AAC's direction. FDTSI's debits of AAC's bank account for the remainder of the AAC Outstanding Payments were returned unpaid between February 19, 2013 and March 20, 2013. FDTSI is informed that AAC filed Articles of Dissolution with the Florida Secretary of State on February 22, 2013. FDTSI has not been able to obtain payment from AAC for any of the $2,489,940 in AAC Outstanding Payments.

32.     On February 27, 2013, Plaintiff submitted a Notification of Claim to Defendant regarding AAC related losses.

**Jet Reverse**

33.     At the direction of Jet Reverse, FDTSI made a series of payments to carriers. Prior to January 2013, FDTSI made several payments at the direction of Jet Reverse, and FDTSI successfully debited Jet Reverse's bank account to obtain reimbursement for those payments. Jet Reverse had a 30 day extended payment period pursuant to the PayCargo Credit Program. Between January 14, 2013 and February 13, 2012, at the direction of Jet Reverse, FDTSI made a number of payments that totaled $2,491,600 (the "Jet Reverse Outstanding Payments"). On February 13, 2013, FDTSI debited Jet Reverse's bank account for the first of the Jet Reverse Outstanding Payments. The debit was returned unpaid (Non-Sufficient Funds). FDTSI immediately suspended Jet Reverse's account, preventing any further payments to carriers at Jet Reverse's direction. FDTSI's debits of Jet Reverse's bank account for the remainder of the Jet

Reverse Outstanding Payments were returned unpaid between February 19, 2013 and March 20, 2013.  FDTSI is informed that Jet Reverse filed Articles of Dissolution with the Florida Secretary of State on February 14, 2013.  FDTSI has not been able to obtain payment from Jet Reverse for any of the $2,491,600 in Jet Reverse Outstanding Payments.

      34.     On February 27, 2013, Plaintiff submitted a Notification of Claim to Defendant regarding Jet Reverse related losses.

**NY Logistics**

      35.     At the direction of NY Logistics, FDTSI made a series of payments to carriers. Prior to September 20, 2012, FDTSI made more than 1,000 payments to carriers at the direction of NY Logistics, and FDTSI successfully debited NY Logistics' bank account to obtain reimbursement for those payments.  NY Logistics had a 30 day extended repayment period pursuant to the PayCargo Credit Program.  Between August 21, 2012 and September 24, 2012, at the direction of NY Logistics, FDTSI made a number of payments that totaled $354,952.60 (the "NY Logistics Outstanding Payments").  On September 20, 2012, FDTSI debited NY Logistics' bank account for the first of the NY Logistics Outstanding Payments.  The debit was returned unpaid (Non-Sufficient Funds).  FDTSI immediately suspended NY Logistics' account, preventing any further payments to carriers at NY Logistics' direction.  FDTSI's debits of NY Logistics' bank account for the remainder of the NY Logistics Outstanding Payments were returned unpaid between September 25, 2012 and October 29, 2012.  Plaintiff unsuccessfully attempted to collect the NY Logistics Outstanding Payments.  FDTSI notified Defendant of the NY Logistics Outstanding Payments in February 2013, and Defendant agreed to extend Plaintiff's claim filing deadline until March 9, 2013.  FDTSI has been unable to obtain payment from NY Logistics for any of the $354,952.60 in Outstanding NY Logistics Payments.  At the

request of Defendant, Plaintiff placed the account with Defendant's collections operation on February 5, 2013.

36. On March 7, 2013, Plaintiff submitted a Notification of Claim to Defendant regarding the NY Logistics related losses. Although Defendant has advised Plaintiff orally that it has rejected the NY Logistics claim, Defendant to date has refused to explain the denial in writing.

## Defendant's Refusal to Honor Its Policy Obligations to Plaintiff

37. Defendant sent a letter dated April 2, 2013 denying the AAC and Jet Reverse claims, stating: "Euler Hermes North America has received and reviewed the above-captioned claims [AAC and Jet Reverse] and has determined that they are not covered per the terms and conditions of the Policy." Despite the fact that AAC and Jet Reverse had been approved by Defendant as Named Buyers under the Policy, and despite Defendant's thorough knowledge of the PayCargo System business model, Defendant wrongly asserted in the April 2, 2013 letter that Plaintiff's business was not "Freight/Logistics," the Covered Product identified on the declaration page of the Policy. (*See* Ex. A at 1.)

38. Plaintiff responded to Defendant's letter on May 24, 2013. In that letter, Plaintiff explained that the services provided to AAC and Jet Reverse are the billing and payment services that Plaintiff has always provided and that Defendant well understood the nature of these services based on, among other things: (a) Defendant's more than 20 years of experience with EFS, on whose business model Defendant was informed the PayCargo System was designed; (b) numerous communications between FDTSI and Defendant between 2008 and 2013 regarding the PayCargo System, including a lengthy meeting in Tennessee among Courts, FDTSI Director of Finance Scott Vogelsang, Macaluso, and Defendant's Assistant Vice President Paul Drinks in

August 2012 during which Courts described the PayCargo System in detail, and specifically focused on the role of freight forwarders such as Buyers AAC and Jet Reverse; (c) Defendant's review of the paycargo.com website that publicly describes the PayCargo System in detail; (d) Defendant's own repeated underwriting of NY Logistics, AAC and Jet Reverse; and (e) Defendant's offer in February 2013 to renew the credit risk policy for the 2013-2014 policy period.

39. In the May 24, 2013 letter, Plaintiff asked Defendant to reconsider the position that Defendant took in its April 2, 2013 letter, and requested a response by June 7, 2013. To date, Defendant has not provided a substantive response to the May 24, 2013 letter, and Defendant has not paid any of the amounts claimed by Plaintiff relating to the NY Logistics, AAC and Jet Reverse credit losses. The total amount currently due and owing from Defendant for these credit losses, after deducting Plaintiff's 10% co-insurance, is in excess of $4.7 million.

40. Defendant has no good-faith basis or substantial legal grounds for taking the position that the Policy does not cover the services provided to NY Logistics, AAC and Jet Reverse, and the attendant credit risk of non-payment by these and other PayCargo System customers that have been approved as Buyers under the Policy by Defendant.

41. Defendant has wrongfully refused coverage, putting its financial interests above its insured's.

42. Defendant's baseless denial of coverage has left FDTSI with more than $4.7 million in unreimbursed credit losses.

## COUNT I
## BREACH OF CONTRACT

43. Plaintiff incorporates by reference, as if fully set forth herein, the facts set forth in paragraphs 1 – 42 above.

44. The Policy is an insurance contract pursuant to which Defendant was paid substantial premiums in exchange for providing broad credit risk insurance coverage, including coverage for the credit losses relating to NY Logistics, AAC and Jet Reverse.

45. By refusing to reimburse FDTSI for these losses, Defendant has expressly and wrongfully repudiated its coverage obligations and declined to honor the promises it made when it issued the Policy. Defendant's wrongful repudiation of its coverage obligations to FDTSI is a breach of the Policy.

46. As a result of Defendant's breach of the Policy, FDTSI has sustained substantial damages, in an amount to be established at trial, for which Defendant is liable to FDTSI.

## COUNT II
## BAD FAITH REFUSAL TO PAY

47. Plaintiff incorporates by reference, as if fully set forth herein, the facts set forth in paragraphs 1 – 46 above.

48. The Tennessee Insurance Code, Tenn. Code Ann. § 56-7-105(a) provides:

> The insurance companies of this state, and foreign insurance companies and other persons or corporations doing insurance or fidelity bonding in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest on the bond, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that the failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided, further, that the additional liability, within the limit prescribed, shall, in

the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

49.     The Policy became due and payable when Plaintiff submitted the claims to Defendant.

50.     Plaintiff made formal demands for the payment of these claims.

51.     Defendant has denied coverage, and has failed to respond substantively to Plaintiff's request to reconsider its position.

52.     Defendant's refusal to pay is not in good faith.

53.     As a direct result of Defendant's bad faith refusal to pay Plaintiff's claims relating to NY Logistics, AAC and Jet Reverse, FDTSI has suffered additional expense, loss, and injury including, but not limited to, the attorneys' fees and other costs associated with seeking from Defendant the insurance coverage to which FDTSI is entitled under the Policy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that the Court:

(1)     enter judgment on Count I in the Complaint in favor of Plaintiff and against Defendant;

(2)     enter judgment on Count I of the Complaint for compensatory damages in favor of Plaintiff in the amount of the loss suffered by Plaintiff relating to the NY Logistics, AAC and Jet Reverse claims;

(3)     enter judgment on Count II of the Complaint in favor of Plaintiff and against Defendant; and

(4)     enter judgment on Count II of the Complaint for damages pursuant to Tenn. Code Ann. § 56-7-105(a), including the additional expense, loss, and injury including attorney fees incurred by Plaintiff as a result of Defendant's refusal to pay Plaintiff's loss for covered claims.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands that all claims in this action be tried to a jury.

Dated: July 19, 2013

Respectfully submitted,

/s/ Johh S. Golwen
John S. Golwen (TN BPR # 014324)
Annie T. Christoff (TN BPR # 026241)
BASS, BERRY & SIMS, PLC
100 Peabody Place, Suite 900
Memphis, Tennessee 38103
Telephone:   (901) 543-5900
Facsimile:    (901) 543-5999
Email:         jgolwen@bassberry.com
                  achristoff@bassberry.com

AND

David M. Greenwald
*pro hac vice request to be submitted*
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois 60654-3456
Telephone:   (312) 923-2774
Facsimile:    (312) 840-7774
Email:         DGreenwald@jenner.com

*Attorneys for Plaintiff, First Data Transportation Services, Inc.*